IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>TRAVIS LEE MCKIE,<br><br>    Defendant. | No. 3:20-CR-00124<br><br>**SENTENCING MEMORANDUM** |

The undersigned submits this Sentencing Memorandum on behalf of Defendant, Travis L. Mckie, in support of his positions on sentencing issues to be resolved at the time of his sentencing hearing.

## TABLE OF CONTENTS

**SENTENCING ISSUES** ...................................................................................................2

**WITNESSES** ...................................................................................................................2

**EXHIBITS** .......................................................................................................................2

**BACKGROUND** ............................................................................................................2

   I.  **WHETHER THE CHILD PORNOGRAPHY GUIDELINES ARE
      OVER REPRESENTATIVE**……………....…………………………………...…..4

   II.  **WHETHER THE DEFNEDANT SHOULD RECEIVE ACCETANCE OR
       OBSTRUCTION**………………………….................................................................10

**CONCLUSION**………………………………………………………………….………..13

## SENTENCING ISSUES:

I.   Whether the Child Pornography Guidelines are Over Representative

II.  Whether the Defendant Should Receive Acceptance or Obstruction

## WITNESSES

Defendant may call witnesses to testify about 3553(a) factors.

## EXHIBITS

Defendant does not intend to present exhibits at this time.

## BACKGROUND

Defendant was charged in a two-count indictment on November 4, 2020 with Production of Child Pornography in violation of 17 U.S.C. §§ 2251(a) and 2251(e) during two different periods of time. On August 15, 2021, the defendant pled guilty to one count, and the plea was accepted by the district court.

The defendant was born in 1980 in Aiken, South Carolina. (PSR, ¶ 78). McKie was raised in a single parent household in which his mother struggled, at times, to provide enough food for the family. (PSR, ¶ 78). The area in which the defendant lived was considered the "projects," and a "rough" part of said projects. (PSR, ¶ 78). On occasion, the defendant was subjected to physical abuse in his early teens. (PSR, ¶ 78).

The defendant attended school until approximately ninth grade when he quit attending. (PSR, ¶ 105). He has some history of substance abuse and manic depression. (PSR, ¶¶ 96, 99-102). In 2007, the defendant was incarcerated for a period of 15 years. (PSR, ¶ 67). The defendant has been incarcerated ever since. (PSR, ¶ 79). During his incarceration, he has not been able to complete programming. (PSR, ¶ 79).

In November 2019, the defendant came into contact with MV#1. (PSR, ¶ 13). The two

met online, and both initially lied about their ages although MV#1 did subsequently disclose she was 15. (PSR, ¶ 13). The two exchanged nude images. (PSR, ¶ 13). Each party would request and/or provide images at various times. (PSR, ¶ 14).

The form of relationship which developed between McKie and MV#1 is more complex than either the Government or the PSR imply. This is not to say it was appropriate, justified, or legal. Rather, it is to point out this relationship was not as one sided or aggressive as the selected messages appearing in the PSR. For example, the following exchange took place on November 30, 2019:

> Defendant:   Good morning slut
>
> MV#1:        Please stop calling me that
>
> Defendant:   Sorry, bby
>
> Defendant:   You don't enjoy verbal abuse boo?
>
> MV#1:        Not when we're not doing something sexual
>
> Defendant:   Ok bby
>
> Defendant:   How's everything
>
> MV#1:        It's ok, wbu (what about you)?

(Discovery, Bates Stamp 362-363). Thereafter, a normal non-sexual and respectful conversation occurs between MV#1 and the defendant. On December 2, 2019, the following conversation occurred in the midst of sexual discussions:

> MV#1:        I can't I scared, I heard knocking at our door and its 11;29 p.m.
>
> Defendant:   Wtf
>
> Defendant:   Be safe bby
>
> Defendant:   Pig slut

> Defendant:   Where's your mom bby
>
> MV#1:   At her boyfriends….like usual
>
> Defendant:   So you're home alone?

Thereafter, the defendant and MV#1 discussed her brother was home and the family's general living arrangements. During the conversation the defendant reassured MV#1 she should not be scared. (Discovery Bates Stamp 401-404).

On December 4, 2019, MV#1 expressed to the defendant she was not in the mood to engage in master/slave behaviors.

> Defendant:   Ok slut
>
> MV#1:   Can you not call me that tonight, I'm going through some things rn and degrading me rn is just wanting to make me die.
>
> Defendant:   I'm sorry. It's OK
>
> MV#1:   Thank you.
>
> Defendant:   Sorry babe I hop things change for the better and fast too. You're welcome.
>
> MV#1:   IT probably wont its been like this since 4 grade
>
> Defendant:   What's going on bby? You can talk to Daddy
>
> MV#1:   Just bullying
>
> Defendant:   I'll fuck someone up behind what's mines. You will get the last laugh if that's what you want baby.
>
> MV#1:   No its ok I'm used to it.
>
> Defendant:   Sorry baby. It won't last forever nothing last forever boo.

(Discovery Bates #418-419). At other points, the two simply converse about their days such as MV#1's boring crew meeting and watching youtube. (Discovery, Bates #467-468). They also

4

speak about MV#1's joint disorder and pets at various points. (Discovery Bates #476-479). And the defendant discloses information about himself. (Discovery Bates, #494-496). By December 9, 2019, the communications between Defendant and MV#1 were done.

All of these events occurred while the defendant was incarcerated in Kirkland Correctional Institution in Columbia, South Carolina. Within the South Carolina prison system the practice of using child pornography to blackmail others was a rampant issue which was part of the culture. See:  https://www.thestate.com/news/state/southcarolina/article238655293.html; and

https://www.justice.gov/usao-sc/pr/south-carolina-inmate-sentenced-federal-prison-role-military-sextortion-scheme.  Such culture clearly has a desensitizing effect.

Additional facts may appear herein where relevant.

## ARGUMENT

I. **WHETHER THE CHILD PORNOGRAPHY GUIDELINES ARE OVER REPRESENTATIVE**

There is a strong argument the guidelines involving child pornography are of less assistance in other guidelines in fashioning an appropriate sentence. For example, USSG § 2G2.2(b)(6) applies when the "offense involved the use of a computer…for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material." This enhancement moves the defendant into a category of life. Although the plain language of USSG § 2G2.2(b)(6) appears to require the court impose the two-level enhancement; the enhancement promotes double counting and overstates the seriousness of the offense.

It is conceptually difficult to understand, in the current day and age, how this offense could be committed without the use of a computer. The argument presented here is the Court

should vary of depart downward based upon the enhancement being a form of double counting and also the application of two additional levels overstates the seriousness of the offense. Each argument will be address in turn.

Double counting occurs "when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Strong*, 826 F.3d 1109, 116 (8th Cir. 2016) (quoting *United States v. Hipenbecker*, 115 F.3d 581, 583 (8th Cir. 1997)). Double counting is impermissible "when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." *Id.* (quoting *United States v. Waldner*, 580 F.3d 699, 707 (8th Cir. 2009)). Double counting can be permitted but where the Sentencing Commission intended each guideline section to further an independent purpose of sentencing. *United States v. Chapman*, 614 F.3d 810, 812 (8th Cir. 2010).

The double counting arises here because it is impossible to imagine how this defendant could have engaged in the conduct at all without the presence of a computer. There is simply no way an individual who did not produce a single image himself would have this many images without the use of a computer which provides the mechanism for acquiring and storing this large number. See Jessica A. Ramirez, *Propriety of Internet Restrictions for Sex Offenders Convicted of Poesssion of Child Pornography: Should We Protect Their Virtual Liberty at the Expense of the Safety of Our Children?*, 12 Ave Maria L. Rev., 123, 125 (2014) ("through most of the twentieth century…these images were usually produced at the local level, were costly and of poor quality, and were difficult to acquire"). Prior to the advent of the Internet, "production and duplication of [child pornography] required expensive equipment of the kind not normally found in the average home. To distribute images of child abuse, one had to either personally transport

them or rely on a domestic mail carrier. Unsurprisingly, these challenges and risks may have served as barriers to offending for some persons who would have otherwise been inclined to obtain [child pornography]." Erik Faust, et al., *Child Pronography Possessors and Child Contact Sex Offenders: A Multilevel Comparison of Demographic Characteristics and Rates of recidivism*, Sexual Abuse: A Journal of Research and Treatment (feb. 19, 2014), http://sax.sagepubl.com/content/early/2014/02/18/1079063214521469, at 2.

Even if the Court rejects this double-counting argument, there are plenty of reasons to find the enhancement overstates the seriousness of the offense. In *Packingham v. North Carolina*, 137 S.Ct. 1730, 1735 (2017) the United States Supreme Court suggested courts must reconsider the character of computers and their import to the modern public square. Computers are the way people communicate in today's world. This would be like having an enhancement apply because someone used a postal carrier for delivering a magazine with child pornography. The penalty does not make any sense.

Perhaps this would be a good time to argue the point that is none of the child pornography guidelines make a tremendous amount of sense. Rather they are the product of political expediency and point scoring by elected officials. Other courts have acknowledged application of an enhancement for use of a computer makes very little sense in child pornography and, by extension, child sex trafficking cases. *See, e.g., U.S. v. Beiermann*, 599 F. Supp. 2d 1087, 1104–06 (N.D. Iowa 2009) (a strong policy disagreement by Judge Bennett with a collection of cases and authorities regarding a similar enhancement under USSG § 2G2.2).

The purpose of a sentencing enhancement is to reflect the seriousness of aggravated facts which make the act more dangerous or harmful than the "baseline" case established by a particular base offense level. But, an "ordinary" child pornography case involves the use of

computers, because that is how humans communicate with each other: this enhancement "thus, blurs logical differences between least and worst offenders, contrary to the goal of producing a sentence no greater than necessary to provide just punishment." *Id.* at 1105.

One of the foundational rules of our criminal justice system is that punishment should be commensurate with the crime. The need to tailor sentences to the dangers and needs of the individual being sentenced is an important component of such foundational rules. A substantively reasonable sentence is one that is proportionate to the seriousness of the circumstances of the offense and the offender. Stated differently, the sentence must be sufficient, but not greater than necessary, to comply with the purposes of § 3553(a). Proportionality in sentences encourages a fairer and more just system for both defendants and society. Increasingly the child pornography guidelines have become subject to closer scrutiny.

The two broad categories of child pornography offenders can be divided into producers and viewers. But the manner in which the guidelines create base offense levels does a poor job of differentiating between these two categories. The end result is that child pornography possessors receive significantly longer sentences than hands on abusers. Carissa Byrne Hessick, *Disentangling Child Pornography from Child Sex Abuse*, 88 Wash. U.L. Rev. 853, 860 (2011); *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) ("The iron of the court's conclusion in this area…is that the Guidelines actually punish some forms of direct sexual contact with minors more leniently than possession or distribution of child pornography.").

This sentencing memorandum will not belabor the issues with the child pornography sentencing scheme. Here in Iowa Judge Bennet articulated those concerns exhaustively in *U.S. v. Beiermann*, 599 F. Supp. 2d 1087, 1104–06 (N.D. Iowa 2009). More recently Judge Jack B. Weinstein set forth an exhaustive analysis in *United States v. R.V.*, 157 F.Supp.3d 207 (E.D.

New York, 2016).  The analysis from both courts is adopted and asserted here.

As a final matter the undersigned notes the defendant's chances for rehabilitation are excellent.  The Government has published a study concerning recidivism of offenders who were convicted of non-production child pornography offenses.  "Report to Congress: Federal Child Pornography Offenses" available at https://www.ned.uscourts.gov/internetDocs/jpar/RGK-FSR2014-Recidivism%20By%20Child%20Pornography%20Offenders.pdf.  A copy of this study is attached to this sentencing memorandum.

The study included more than 600 offenders.  *Id.* at p.295-96.  The study classified recidivism into general recidivism and sexual recidivism.  Sexual recidivism included both hands on and non-contact offenses.  *Id.* p. 297  The average offender was followed by the study for more than 8 years.  *Id.* at p. 298.   While the general crime recidivism was 30% (equal with other types of offenses) the sexual recidivism was less than 8%.  *Id.* at p.300.  Only 22 of more than 600 were arrested for contact offenses, 14 for child pornography and the remaining 9 involved non-contact offenses involving obscenity, likely looking at pornography in violation of supervised release conditions.  *Id.* at p.300-301.  The vast majority, more than 70 percent did not recidivate at all.  A subsequent study encompassing far more individuals also found child pornography offenders recidivated at low rates.  Thomas H. Cohen, Michelle C. Spidell, *How Dangerous Are They? An Analysis of Sex Offenders Under Federal Post-Conviction Supervision*, September 2016, available at https://www.uscourts.gov/sites/default/files/80_2_4_0.pdf.

According to the United States Sentencing Commission 64,565 offenders were sentenced pursuant to the child pornography guidelines in 2020.  The average sentence for offenders convicted of child pornography were sentenced to 102 months in prison.  The average sentence for those convicted of trafficking in child pornography was 133 months.  The average sentence

for offenders convicted of receiving child pornography was 95 months. As further evidence of how out of line the guidelines are in practice more than 61% of defendants sentenced under the child pornography guidelines received a variance. See:

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Child_Pornography_FY20.pdf.

Here there was direct contact with a 15 year-old. The seriousness of the offense is, however, adequately captured in the mandatory minimum of 180 months. The aggravating nature of the offense is balanced out by the absence of evidence that the defendant did not share or otherwise distribute any of MV#1's materials in combination with the fact that a 180 month sentence is substantial.

## II. WHETHER THE DEFENDANT SHOULD RECEIVE ACCEPTANCE OR OBSTRUCTION

The PSIR as drafted imposes a two-level enhancement for obstruction and The Government and the PSR focus on the defendant's conduct prior to his guilty plea to suggest the defendant should have an obstruction enhancement and should not receive acceptance. Under the facts of this case Mr. McKie should receive acceptance as the obstruction enhancement and acceptance reduction serve different purposes in cases such as the one at bar.

It is true, a plea in and of itself is not the sole or only consideration for whether acceptance applies. The defendant has truthfully admitted responsibility for his wrongdoing through the plea. As noted by application note 3 to USSG § 3E1.1:

> Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under §1B1.3 (Relevant Conduct)…will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a).

USSG § 3E1.1 n. 3. While application of an enhancement for obstruction of justice pursuant to § 3C1.1 may indicate acceptance of responsibility credit is not warranted, there is no *per se* prohibition upon applying both sections. Rather, as noted by application note 4 to § 3E1.1, both the enhancement pursuant to § 3C1.1 and the reduction pursuant to § 3E1.1 may apply in extraordinary cases.

      A key case on the topic is *United States v. Honken*, 184 F.3d 961 (8th Cir. 1999) is factually distinguishable from the case at bar. In *Honken* the defendant was sentenced to 292 months for conspiracy to distribute methamphetamine. *Id.* at 962. During a four-day sentencing the Government presented evidence the defendant had (1) caused the disappearance of one or more persons including prospective prosecution witnesses in 1993; (2) attempted to kill witnesses while on pretrial release in 1996; (3) after his detention in 1996 had again attempted to kill other cooperating witnesses; (4) had attempted to escape from the county jail during his pretrial detention; and (5) procured another person to conceal evidence material to his case. *Id.* at 964.

      The defendant argues the Government here is making the same error as the trial court in *Honken* but from the opposite side of the coin. In *Honken* the trial court was reversed because the 8th Circuit found Judge Bennet's standard would grant acceptance in every case so long as no obstruction occurred following a guilty plea. *Id.* at 970 ("the district court's definition of an 'extraordinary case' is so broad that it swallows the 'ordinary' case."). Here, however, the position appears to be that in every case where a defendant attempted to hide their crime prior to indictment the only path to acceptance is cooperation. That simply cannot be the legal standard.

      In *United States v. Tyerman*, 701 F.3d 552 (8th Cir. 2012) a defendant received obstruction of justice based upon his manufacture of two homemade handcuff keys, his efforts at practicing their use, and his disclosure of his plans to escape. *Id.* at 558 and 566. Here the defendant does not dispute he possessed the handcuff key. Nor does he dispute what another inmate stated, rather he

11

objects to the truth of that inmate's statements. There is absolutely no evidence of a plan to escape when the defendant is from South Carolina so has no one in the area, his phone calls are monitored, and his correspondence is monitored. There was simply no plan to use the handcuff key.

To that end it is unfair to say the defendant "has not clearly accepted" responsibility where the alleged obstructive conduct has nothing to do with the underlying offense, and the defendant pled guilty after the event involving the handcuff key.

Here the defendant deserves credit for accepting responsibility, saving the Government and its witnesses the necessity of testifying and there is insufficient evidence of obstruction.

## CONCLUSION

As always, the Court's goal is to assess a sentence which is no greater than necessary to accomplish all of the goals of sentencing. Here the defendant suggests a sentence of 180 months or less achieves all of those goals. While there are some aggravating factors there are also numerous mitigating factors. A sentence of 180 months is nearly five years longer than the average sentence for child pornography offenders.

Respectfully submitted,

/s/ *Eric D. Tindal*
Eric D. Tindal
Keegan Tindal & Jaeger
103 East College Street, Suite 312
Iowa City, IA 52240
Phone: (319) 887-6900
Fax: (319) 668-2754
eric@keeganlegal.com
ATTORNEYS FOR DEFENDANT

**The undersigned hereby certifies that a true copy of the foregoing instrument was served upon each of the attorneys of record of all of the parties, or upon pro se parties, to the above-entitled cause by:**
☐ **U.S. Mail**   ☐ **Fax**   ☐ **Hand Delivered**   ☐ **Overnight Courier**   X **CM-ECF**

          /s/ Eric D. Tindal                              (Date)   12  /   19   /    2021